**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | 2:16-cr-00249 |
| | ) | 2:12-cr-00173 |
| v. | ) | |
| | ) | Chief Judge Mark R. Hornak |
| ANTOINE WALLS, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

**Mark R. Hornak, Chief United States District Judge**

Defendant Antoine Walls has currently served about twenty-nine (29) months in custody

of an aggregate forty-eight (48) month in custody sentence for the felon in possession conviction

to which he pleaded guilty in the above-captioned matter, and the related supervised release

violation at No. 12-cr-173. The underlying incident in both matters involved a high-speed police

chase that Mr. Walls initiated in an apparent effort to conceal his unlawful possession of two (2)

high-powered firearms and an extended magazine. That chase resulted in a violent car crash

which left Mr. Walls seriously injured, including temporary paralysis of his lower extremities

followed by significant current limitations on his mobility.

At the time of sentencing, the Court recognized the physical challenges that the

Defendant would face while incarcerated and therefore sentenced Mr. Walls to a below-

Guidelines term in custody and recommended that he be placed at a Federal Medical Center

("FMC") so that he could have access to appropriate care. Mr. Walls was initially placed at FMC

Rochester (MN) where his physical condition steadily improved. And by August 2019, he no

longer required "FMC" designation and was transferred to the Federal Correctional Institution

("FCI") in Loretto, Pennsylvania. As of the date of this Opinion, Mr. Walls remains resident at FCI Loretto and appears to be classified as a Care Level 1 or 2 inmate.

In June 2020, Mr. Walls filed an administrative request for compassionate release with the Bureau of Prisons ("BOP") based on his debilitated medical condition and his concerns regarding the COVID-19 pandemic. That request was denied by the Warden of FCI Loretto on June 8, 2020. Now, Mr. Walls moves this Court for a Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), stating that his asthma and spinal court injury, combined with the heightened risk of contracting COVID-19 while in custody, create unacceptable risks to Mr. Walls's life such that compassionate release is warranted. (ECF No. 62.)

The Court concludes that Mr. Walls's Motion is properly before it, that his medical conditions rise to an "extraordinary and compelling" level, and that release from a BOP custodial setting is now warranted on the record before the Court. The Court concludes that upon consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), a reduction of Mr. Walls's sentence in the nature of converting the balance of Mr. Walls's BOP and "follow along" community corrections ("halfway house") custody to an additional period of supervised release with a condition of home detention during that additional period of supervised release is appropriate. Accordingly, the Defendant's Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 62 is GRANTED on such terms.

## I. BACKGROUND

On August 24, 2016, Mr. Walls was released from BOP custody in the matter docketed at No. 12-cr-173 and began serving a four-year period of federal supervised release. (ECF No. 34, at 4.) The following day, on August 25, 2016, Mr. Walls was involved in a high-speed police

chase and sustained serious injuries as a result. (*Id.*) As the Government recites, the facts of this

case are stark and dramatic:

> On August 25, 2016, police officer Molinaro was on duty as an officer with the Leet
> Township Police Department. At approximately 3:06 a.m., Officer Molinaro pulled out of
> the Leet Township Police Department driveway onto Ambridge Avenue in his marked
> police vehicle. As he did so, he noticed a vehicle traveling south behind him because it
> made several abrupt brake movements. The officer pulled into the nearby bowling alley
> parking lot to allow this vehicle, a BMW with Pennsylvania tag KCK-2277, to pass. At
> that time, the officer observed the BMW slow to well below the posted speed limit of 25
> miles per hour. Officer Molinaro followed the vehicle in his patrol car and radioed the
> vehicle plate number to dispatch. Officer Molinaro continued to follow the vehicle for
> approximately a quarter of a mile, to the intersection of State Route 65 and Cross Street,
> at which point, dispatch notified him that the suspect vehicle's plate was suspended and
> that the vehicle was registered to Antoine Walls. Officer Molinaro followed the BMW
> through the intersection, turned right onto State Route 65 and initiated a traffic stop of the
> BMW by turning on his patrol vehicle's lights and siren.
>
> The BMW pulled onto the shoulder of State Route 65 and stopped. Officer Molinaro
> pulled his patrol car behind the BMW and began to exit his vehicle. As the police officer
> exited his vehicle, the BMW drove away at a high rate of speed. Officer Molinaro
> radioed for additional units and began pursued the BMW. At no point was the BMW out
> of Officer Molinaro's sight. The BMW continued to accelerate but Officer Molinaro
> slowed his rate of speed at State Route 65 and 14th Street because he knew of a curve in
> the road ahead. The BMW continued at a high rate of speed, lost control at the curve, and
> struck the center island at State Road 65 and Merchant Street. The BMW then crossed
> into the oncoming traffic lane and struck a guardrail, causing the vehicle to catapult and
> spiral several times. The driver of the BMW, the only person in the vehicle, was ejected
> onto the street through the driver's side window.
>
> Officer Molinaro observed the driver laying in the southbound lane, conscious and
> bleeding from the mouth. Officer Molinaro called for an ambulance and approached the
> driver on foot. The driver asked Officer Molinaro to help him up, stating "My bad." The
> driver later was identified as owner of the vehicle, Antoine Walls.
>
> Officer Molinaro observed several .40 caliber rounds of ammunition laying in the area of
> Walls' body. Following the trail of ammunition scattered along the road, Officer
> Molinaro recovered a Pennsylvania identification card belonging to Antoine Walls. From
> the area of the initial impact of the crash (approximately 10 feet from the location of
> Walls' body), Officer Molinaro also recovered a Chase bank card belonging to Antoine
> Walls and observed more .40 caliber ammunition scattered on the road. From this area,
> police recovered a spring and base plate of an extended 30 round .40 caliber magazine.
> Along the roadway, from the area of the initial impact of Walls' vehicle and the area
> where Walls' body landed after he was ejected from his vehicle, police recovered two,
> loaded .40 caliber firearms, one of which contained the extended magazine for the

recovered spring and base plate. One recovered firearm, a .40 caliber Glock 23 with serial number DTA731US was reported stolen from Wilkinsburg in 2010; the second firearm recovered is a .40 caliber Glock 27 with serial number KNA039. Pieces of defendant's vehicle were also in the area where the firearms were recovered.

(*Id.* at 4–5.)

Mr. Walls was seriously injured as a result of that accident. (*Id.* at 14.) And he was hospitalized for about a month following. (*Id.*) Most notably, Mr. Walls sustained "a T7–T12 spinal cord injury that [] left him incontinent of both bowel and bladder, with diminished sensation from the waist down and both legs [were] essentially paralyzed with only minimal capacity for movement." (*Id.*) And, as of October 2016, Mr. Walls was "in need of aggressive spinal cord injury therapy provided at a center devoted to spinal cord injuries." (*Id.*)

On November 15, 2016, a federal Grand Jury sitting in this District returned a one (1) count Indictment, charging Mr. Walls with possession of firearms and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Mr. Walls was arraigned on December 7, 2016. (ECF No. 6.) Due to the injuries that he sustained as a result of the accident, Mr. Walls was released on bond pending further proceedings, with pretrial supervision that included home incarceration and electronic monitoring. (ECF No. 34, at 14.) Then, on September 8, 2017, Mr. Walls pleaded guilty to the felon in possession charge in the above-captioned matter.[1] (ECF No. 28.)

---

[1] The offense to which Mr. Walls pleaded guilty in the above-captioned matter also violated the conditions of supervised release associated with his previous drug trafficking conviction at No. 12-cr-173, which also proceeded before this Court. On May 8, 2018, the Court revoked the term of supervised release at No. 12-cr-173 and sentenced Mr. Walls to a term of custody of ten (10) months, with six (6) months to be served concurrently with the sentence at ECF No. 16-cr-249. (No. 12-cr-173, ECF No. 79.) In other words, Mr. Walls would still have four (4) months left in custody based on the supervised release violation at 12-cr-173 once he is done serving the term of custody associated with the matter at No. 16-cr-249. Thus, Mr. Walls's total custodial sentence was forty-eight (48) months. With full "good time" credits, that is reduced to slightly less than forty-one (41) months. In the usual course, the BOP would release Mr. Walls to a halfway house for the last six (6) months of that period of time, or beginning about six (6) months from now.

At the time of sentencing at 16-cr-249 in April 2018, the Court was made aware of Mr. Walls's physical limitations. Specifically, although Mr. Walls initially used a wheelchair to ambulate following his accident, his physical condition had improved after engaging in therapy and by May 2017 he was reliant only on a cane. (ECF No. 34, at 14–15.) And as of December 2017, the United States Probation Office reported that Mr. Walls would "require continued therapy for his rehabilitation" and that Mr. Walls then "attend[ed] physical therapy two to three times per week." (*Id.*)

In addition, at the sentencing hearing before the Court on April 18, 2018, counsel for the Defendant noted that while Mr. Walls's "level of mobility and independence [had] improved" since the date of his accident, he would still face physical challenges if incarcerated. For example:

> [i]f he was to be handcuffed behind his back, he would not be able to walk or get up from the floor on his own due to his balance. He would not be able to walk independently if his legs were to be shackled. If he was unable to use his cane, he would not be able to walk independently or negotiate stairs.

(ECF No. 57, at 35.)

The Court took such considerations into account when determining Mr. Walls's term of custody. Specifically, the Court noted that the reality in Mr. Walls's case was that the time he would serve would be "harder time" than that served by others, simply because of the physical challenges that he would be required to confront. (*Id.* at 65.) The Court also advised Mr. Walls that "but for [his] health situation and [his] physical circumstances, a sentence within the advisory guideline range in the Court's estimation would be a perfectly appropriate, lawful, and just and fair sentence." (*Id.* at 66.) As a result, the Court found that it was "appropriate and necessary in [Mr. Walls's] case to consider and impose a sentence . . . outside of the advisory Guideline range to take into account the situation [Mr. Walls was] physically in" as he presented

5

himself to the Court on the day of sentencing. (*Id.*) Thus, while the Court found that the advisory Sentencing Guidelines recommended a term of custody of fifty-seven (57) to seventy-one (71) months, the Court instead imposed a sentence of forty-four (44) months in custody. (ECF No. 57, at 32; ECF No. 55.)

Due to his physical condition, Mr. Walls was permitted by the Court to self-report to BOP custody, and he did so on June 12, 2018, or about twenty-nine (29) months ago. (ECF Nos. 55, 74.) In its Judgment, the Court recommended that Mr. Walls be placed at a Federal Medical Center due to his "ongoing limitations of severe spinal trauma, including major mobility issues and bowel incontinence." (ECF No. 55, at 2.) Based on the Court's review of the BOP medical records, it appears that Mr. Walls was placed at FMC Rochester shortly after self-reporting. (*See* ECF No. 72, at 63.) And those records also indicate that he was transferred to FCI Loretto (which is located in this District) in or around August 2019.

Mr. Walls's spinal cord injury appears to have improved since the time he entered BOP custody. Shortly after self-reporting, the BOP issued Mr. Walls resistive exercise bands (presumably meant to assist in his physical therapy), a four-wheel walker, and a single point adjustable cane. (*Id.* at 30.) As of November 2018, Mr. Walls appeared to still be "using a wheeled walker" and his "neurogenic bowel" had not resolved at that time. (*Id.* at 18.) As of June 10, 2019, Mr. Walls was classified as a "Care Level 2" inmate and the BOP medical records indicate that he was then using a cane to ambulate, that he experienced some "decreased sensation" (presumably in his lower extremities) at that time due to his spinal cord injury, and that his "neurogenic bowel [was then] controlled with suppositories." (*Id.* at 4.) A report from FMC Rochester dated June 12, 2019, however, noted that Mr. Walls was classified as "Care Level 1" and that "[a] self-directed therapy program was recommended by physical therapy" and

that Mr. Walls "has remained independent without significant event." (*Id.* at 63; *see also id.* at 8 (noting that Mr. Walls "appears to be [Care Level] 1–2").)

Mr. Walls attended a yearly[2] Chronic Care Clinic appointment on September 24, 2019, the report from which notes that "he ambulates with a cane; he state[d] he did, at one time, have bowel and bladder dysfunction, that that is no longer the case; he state[d] that he has some decreased sensation in the [left] foot and thinks that his [left] calf is somewhat smaller than the [right] calf." (ECF No. 72-1, at 31.) Mr. Walls also reported chronic back pain at that appointment. (*Id.*) And the provider's examination confirmed slight atrophy between the Defendant's calves with "no significant weakness in the lower extremities." (*Id.* at 32.) Additional comments include: "sensation in [left] foot is somewhat decreased to light tough [sic] and vibration" and "abnormal gait." (*Id.*)

The record also indicates that Mr. Walls has a history of asthma. While it appears that this affliction was more prevalent when Mr. Walls was a child and that he does not regularly present symptoms (*see* ECF No. 72, at 4), the record does indicate that as of August 2020, Mr. Walls continues to maintain an active prescription for an albuterol inhaler (ECF No. 72-1, at 66). As of September 2019, Mr. Walls "denie[d] exacerbation or hospitalization within the past year for asthma" and the record notes that he "used albuterol before work-outs twice daily" with "[n]o complaints." (*Id.* at 36.) And the report dated March 9, 2020, indicates that Mr. Walls was instructed to only use his inhaler "as needed to prevent/relieve [an] asthma attack," rather than using it daily. (*Id.* at 26.)

In addition, the record indicates that Mr. Walls potentially suffers from hypertension and mild obesity. Records from 2018 and 2019 note that Mr. Walls "is borderline hypertension" and

---

[2] Counsel for the United States reported that Mr. Walls had an annual exam scheduled for August 24, 2020, but that the results (or the actual occurrence) of which are unknown at this time. (ECF No. 69, at 7.) The Court has not yet been advised of the status or result of any such appointment.

that his "blood pressure has bobbled in the past but [he] is not on medication." (ECF No. 72, at 8,

16.) As of May 2019, his blood pressure "look[ed] ok." (*Id.* at 8.) And records from both 2018

and 2020 note that Mr. Walls's body mass index ("BMI") was calculated at a value of 31–32.8,

which would classify Mr. Walls as "obese." (*Id.* at 18, 28.)

On June 2, 2020, Mr. Walls submitted an administrative request for compassionate

release to the Warden of FCI Loretto, seeking release based on a "debilitated medical condition"

and noting that the COVID-19 pandemic was an unforeseen circumstance that rose to an

"extraordinary and compelling" level. (ECF No. 69-1, at 1.) The Warden denied that request on

June 8, 2020, after conducting a "thorough review" of Mr. Walls's situation, stating that Mr.

Walls's "concern about being potentially exposed to, or possibly contracting COVID-19" did not

warrant release at that time. (ECF No. 62-5, at 1.)

Then, in early August 2020, Mr. Walls contracted the COVID-19 virus. While the BOP

records indicate that Mr. Walls largely appeared to be "asymptomatic" or "minimally

symptomatic" (*see* ECF No. 72-1, at 2–22), counsel for the Defendant asserts that "Mr. Walls

was not one of the fortunate individuals who remained asymptomatic while infected with this

virus. He experienced a number of symptoms, including diarrhea, which is particularly

problematic for an individual like Mr. Walls who struggles to regain control of his bowel and

bladder." (ECF No. 62, at 4.) And at the telephonic oral argument held on September 2, 2020,

counsel for the Defendant stated that Mr. Walls experienced gastrointestinal symptoms including

diarrhea, shortness of breath, and chest pains as a result of contracting the virus. Counsel for the

Defendant also reported that FCI Loretto treated Mr. Walls by placing him "in quarantine for

approximately ten days and then [returning him] to his housing unit." (*Id.*)[3]

---

[3] After the oral argument on the Defendant's Motion, the Court received a handwritten letter from Mr. Walls dated
September 1, 2020. The Court docketed that letter at ECF No. 78, and by Order, authorized counsel to file any

Now, Mr. Walls moves this Court for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).[4] (ECF No. 62.) Essentially, that Motion argues that Mr. Walls's "immediate release" from BOP custody is appropriate because: (1) Mr. Walls's asthma and spinal cord injury, as exacerbated by the COVID-19 pandemic, present "unacceptable risks" to Mr. Walls's life; (2) the BOP "lockdown" prohibits Mr. Walls from engaging in therapy and strength training necessary to assist his physical recovery; and (3) the BOP cannot control the spread of the COVID-19 virus throughout its facilities. (*Id.* at 1–2.) In addition, as to this Court's consideration of the § 3553(a) factors, counsel for the Defendant notes that "Mr. Walls has spent the past four years rehabilitating himself both physically and mentally." (*Id.* at 19.) As such, the Defendant asserts that a reduction in sentence to "time served," followed by "any necessary term of home confinement" is "sufficient but not greater than necessary" to promote the purposes of sentencing. (*Id.* at 22.)

In response, the Government argues that the Defendant's Motion must be denied because Mr. Walls's "medical conditions, alone or in combination, do not meet the definition of 'extraordinary and compelling'" circumstances. (ECF No. 69, at 12.) Specifically, the United States argues that despite the fact that Mr. Walls tested positive for the COVID-19 virus in August 2020, Mr. Walls "has not experienced severe illness from COVID-19, his medical needs

---

statement of position relative to the matters in that letter, ECF No. 79. Counsel for Mr. Walls did so, ECF No. 80, and the Court will consider that filing and Mr. Walls's letter in resolving this Motion. The United States has not responded to either filing.

[4] The Court notes that the Defendant's Motion was only filed at No. 16-cr-249. As noted above, on May 8, 2018, the Court revoked Mr. Walls's term of supervised release in the matter docketed at No. 12-cr-173 and sentenced him to a 10-month term of imprisonment, with six (6) months to be served concurrently with the sentence at 16-cr-249 and four (4) months to be served consecutively. In other words, even if this Court were to grant the Defendant's Motion at 16-cr-249, Mr. Walls would still be detained for four (4) months in the matter at No. 12-cr-173. Because this Court presided over both matters, however, it has authority to reduce Mr. Walls's sentence as to both matters. In light of the facts that it was the offense conduct at 16-cr-249 that triggered the supervised release violation at 12-cr-173, and that the sentence at 12-cr-173 was imposed on that basis, and that the facts and arguments in play in 16-cr-249 overlap completely with those present in 12-cr-173, the Court will treat the Motion as fully applicable to the sentences imposed in both cases.

are being met, and his medical condition is being monitored, almost daily, while being treated for the virus at FCI-Loretto." (*Id.*) In addition, the Government argues that even if Mr. Walls's medical conditions rise to an "extraordinary and compelling" level, the Defendant's "request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community under § 1B1.13 or otherwise merits release under the § 3553(a) factors." (*Id.* at 13.)

The Court held telephonic oral argument as to the Defendant's Motion on September 2, 2020. That same day, the Court was informed that Mr. Walls had then served about twenty-seven (27) months of actual incarceration and that Mr. Walls's release date to home (including any "good-time" credit) is set for October 24, 2021. (ECF No. 74.) In addition, the Court was informed that the BOP intends to move Mr. Walls to BOP community confinement, or a "halfway house," on May 26, 2021. (*Id.*)

This matter is now ripe for disposition.

## II. **LEGAL STANDARD**

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007); *see also Dillon v. United States*, 560 U.S. 817, 819 (2010) ("A federal court generally may not modify a term of imprisonment once it has been imposed."). One such specific authorization is the First Step Act's amendment of 18 U.S.C. § 3582. As amended, that provision allows a court to modify a defendant's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). In addition, the Court must consider: (1) whether the defendant has exhausted the appropriate administrative remedies; (2) the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable; and (3) whether such a

reduction is consistent with applicable policy statements issued by the Sentencing Commission. § 3582(c)(1)(A).

## III.  **DISCUSSION**

After considering the relevant factors, the Court finds that Mr. Walls's Motion is properly before it, including his COVID-19-related concerns. Additionally, the Court finds that Mr. Walls's medical conditions, as exacerbated by his particularized risk for severe illness should he (again) contract the COVID-19 virus, rise to an "extraordinary and compelling" level. In then considering the § 3553(a) factors as the Court is obligated to do, the Court finds that release of Mr. Walls at this point would nonetheless be consistent with the purposes of sentencing in this case, and as such, compassionate release on the terms set out below is appropriate at this time.

### A.  **Administrative Exhaustion**

In order to consider the merits of the Defendant's Motion, the Court must first determine whether Mr. Walls has complied with § 3582(c)(1)(A)'s exhaustion requirement. Prior to petitioning a court for relief under § 3582(c), a defendant must first file an administrative request for compassionate release with the warden of their facility and then either: (1) fully exhaust the BOP's administrative remedies; or (2) wait thirty (30) days from the date their administrative request was filed with the warden. § 3582(c)(1)(A). And the Third Circuit recently confirmed that either of § 3582(c)(1)(A)'s options (acting independently) are sufficient to satisfy the exhaustion requirement. *See United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) (rejecting the argument that a defendant is required to completely exhaust the administrative remedy process if the warden denies a defendant's request within thirty (30) days of receiving it, primarily because "the statute states that the defendant may file the motion [before a district court] thirty days after the warden receives his request").

Here, the Government does not contest the Court's authority to adjudicate the Defendant's Motion based on lack of exhaustion. While the Court does not dispute that assertion and accepts the Government's position that Mr. Walls's Motion is ripe for disposition, the Court must nonetheless determine whether exhaustion is satisfied because our Circuit has held that § 3582(c)(1)(A)'s exhaustion requirement is mandatory.[5] *See United States v. Raia*, 954 F.3d

---

[5] The Government's Response (ECF No. 69, at 4) "submits that the exhaustion requirement of § 3582(c)(1)(A) cannot be excused or waived" because the Third Circuit has held that "section 3582 sets forth a statutory basis for limiting the district courts' jurisdiction," and therefore any "timing requirement" set forth in that section, or a related Rule of Criminal Procedure, is "jurisdictional." *United States v. Higgs*, 504 F.3d 456, 464 (3d Cir. 2007). *Higgs* speaks to whether the time limitation in Rule 35(a) (allowing a district court to correct a sentence within fourteen (14) days after sentencing) is jurisdictional. After considering the "history and purposes of Rule 35," which largely sought to narrow the time during which a sentence could be amended, the Third Circuit held that Rule 35's time limitation was jurisdictional because it derives from the limitation set forth by 18 U.S.C. § 3582(c)(1)(B).

In the Court's judgment, however, *Higgs* does not necessarily speak to whether § 3582(c)(1)(A)'s timing requirement is jurisdictional. Rule 35 is distinct from § 3582(c)(1)(A) for two key reasons. First, the legislative history underlying Rule 35 sought to narrow district court review, while the legislative history supporting compassionate release suggests that Congress instead intended to expand district court review. Second, Rule 35 speaks to the point at which a district court *loses* jurisdiction and § 3582(c)(1)(A) speaks to when a district court *gains* "jurisdiction." As such, *Higgs* does not squarely address whether § 3582(c)(1)(A)'s timing requirement is jurisdictional.

But, a number of courts have expressly addressed the issue of whether § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional. *United States v. Davis*, No. 17-cr-69, 2020 WL 3976970 (M.D.N.C. July 14, 2020) (collecting cases). Most have concluded that the exhaustion requirement does not go to a court's adjudicatory power in the nature of "subject matter jurisdiction" but is better considered as akin to a "claim-processing rule" that limits a court's remedial authority when properly raised. *See, e.g.*, *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020) ("In appearance, [§ 3582(c)(1)(A)'s exhaustion requirement] looks like a claim-processing rule, and in operation it acts like one."). And this Court believes that such an approach is the better view, since the statute itself does not purport to strip the district courts of adjudicatory authority. What we do know is that in our Circuit, the exhaustion requirement is a gateway to relief because "[w]hether jurisdictional or not, [exhaustion under § 3582(c)(1)(A)] is clearly a mandatory requirement, as made clear by the Third Circuit in *Raia*." *United States v. Somerville*, --- F. Supp. 3d ----, 2020 WL 2781585, at *5 (W.D. Pa. May 29, 2020); *see also United States v. Contreras*, No. 17-cr-1872, 2020 WL 4530738, at *2 (S.D. Cal. Aug. 6, 2020) ("This Court need not reach the jurisdictional question because even if the exhaustion requirement in § 3582(c) is non-jurisdictional, it is mandatory and precludes the Court from modifying Defendant's sentence."). While categorization of the exhaustion requirement remains an open question in our Circuit, it appears to this Court to not limit the Court's authority to adjudicate the claim, but also appears to be somewhat hybrid in nature, given the verbiage that our Court of Appeals applied in *Raia* regarding its mandatory nature. *See Raia*, 954 F.3d at 597 ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance.").

In addition, in *Alam*, the Sixth Circuit analogized the exhaustion requirement in § 3582(c)(1)(A) to the administrative filing obligation in Title VII of the Civil Rights Act of 1964. While appealing, such an analog does not appear to be a perfect fit, since in the Title VII context there are at least two (2) entities with an interest in enforcing the administrative hurdle, namely the EEOC or the charged respondent. Here, no similar analog agency is before the Court. While the United States Attorney's Office typically weighs in on the merits of motions for compassionate release that eventually come before a district court, that "agency" does not automatically stand in the

594, 597 (3d Cir. 2020) (mandating "strict compliance" with § 3582(c)(1)(A)'s exhaustion requirement); *see also United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [§ 3582(c)(1)(A)'s] exhaustion requirement does not implicate our subject-matter jurisdiction, it remains a mandatory condition.").

In any event, the Court concludes that Mr. Walls has satisfied § 3582(c)(1)(A)'s exhaustion requirement based on the "thirty-day option" because the BOP has had more than thirty (30) days to consider all of the claims he is now attempting to bring before this Court. Mr. Walls submitted an administrative request for release to the Warden of FCI Loretto on June 2, 2020, seeking release based on a "debilitated medical condition" and noting that the COVID-19 pandemic was an unforeseen circumstance that rose to an "extraordinary and compelling" level. (ECF No. 69-1, at 1.) The Warden denied that request on June 8, 2020, after conducting a "thorough review" of Mr. Walls's situation, stating that Mr. Walls's "concern about being potentially exposed to, or possibly contracting COVID-19" did not warrant release at that time. (ECF No. 62-5, at 1.) As such, the Court finds that the BOP has had more than thirty (30) days to consider the Defendant's overall medical condition, including consideration of those concerns in the context of the COVID-19 pandemic. Mr. Walls has for the reasons noted above exhausted his BOP administrative obligations, both as to his medical conditions generally and as to his particularized COVID-19-related concerns, which the United States has also acknowledged. The Court will proceed accordingly.

---

shoes of the BOP if the exhaustion requirement is not carried out. And, when the United States Attorney's Office does address a motion for compassionate release, it does not appear to the Court that the central purpose of doing so is to represent the BOP. Thus, whether § 3582(c)(1)(A)'s exhaustion requirement can be waived, forfeited, or conceded, as is the case with the administrative filing obligation in Title VII, is not so clear. But resolving that issue does not change the Court's analysis at this juncture because even if the Government concedes as it does here that the exhaustion requirement has been met in Mr. Walls's case, the Third Circuit's precedential opinion in *Raia* suggests that failure to comply with the exhaustion requirement "presents a glaring roadblock foreclosing compassionate release." 954 F.3d at 597. As such, this Court must confirm that Mr. Walls has complied with § 3582(c)(1)(A)'s exhaustion requirement to the extent that it is a gateway to the relief he seeks, even if it does not go to the Court's "subject matter jurisdiction."

## B. "Extraordinary and Compelling" Reasons

Next, the Court must determine whether Mr. Walls's several medical conditions, as exacerbated by the ongoing COVID-19 pandemic, rise to an "extraordinary and compelling" level, such that release could be warranted under § 3582(c)(1)(A)(i).

Section 3582 does not define the phrase "extraordinary and compelling reasons." Instead, Congress delegated that task to the Sentencing Commission. *See* 28 U.S.C. § 994(t) (stating that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission defined "extraordinary and compelling" as it related to the BOP's discretion under the pre-First Step Act version of § 3582(c)(1)(A)(i), but has not updated the applicable Policy Statement, found in the U.S. Sentencing Guidelines Manual ("the Guidelines") § 1B1.13, since the First Step Act became law. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. Apr. 1, 2020).

Despite the fact that the relevant portions of the Guidelines predate the passage of the applicable provisions of the First Step Act, and would be advisory in any event, they do provide some initial benchmarks for the Court's consideration. *See id.* at 397 ("[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A).'") (quoting *Beck*, 425 F. Supp. 3d at 582). For example, the Policy Statement provides that a defendant may show "extraordinary and compelling" reasons for compassionate release based on the defendant's medical condition, age, family circumstances, or "other reasons." § 1B1.13, cmt. n.(1).

Particular to Mr. Walls's situation, the Application Notes to § 1B1.13 of the Guidelines speak to conditions which would support compassionate release in the form of two (2) different medical conditions that can rise to an "extraordinary and compelling" level: (1) terminal illnesses; and (2) non-terminal conditions that substantially diminish the ability of the defendant to provide self-care within the correctional environment. Here, the Court finds that the combination of Mr. Walls's several conditions, paired with the additional risks that he faces due to the COVID-19 pandemic, rise to an "extraordinary and compelling" level pursuant to the "non-terminal" option.

### 1.  The Terminal Illness Option

First, the Court finds that Mr. Walls does not qualify for relief under the "terminal illness" option, because he is not afflicted with a "terminal" condition.

The relevant Application Note suggests that a defendant suffers from a "terminal illness" if they are afflicted with "a serious and advanced illness with an end of life trajectory." § 1B1.13, cmt. n.(1)(A)(i). A "specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required" to prove that an illness is "terminal." *Id.* Examples of terminal illnesses provided by the Guidelines include "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.*

Here, nothing currently before the Court suggests that Mr. Walls's current conditions (asthma and spinal cord injury) are so serious or advanced in nature that they are marked by an "end of life trajectory." As such, the Court concludes that Mr. Walls does not qualify for compassionate release based upon his affliction with a "terminal illness."

### 2.  The Non-Terminal Illness Option

The Court, however, does conclude that Mr. Walls could qualify for relief under the "non-terminal" illness option, especially in the context of the COVID-19 pandemic. The Sentencing Commission's Policy Statement suggests that non-terminal medical conditions may constitute extraordinary and compelling reasons if "a defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, cmt. n.(1)(A)(ii).

Here, there is no doubt that Mr. Walls is suffering from a serious physical condition from which he is not expected to fully recover (at least anytime soon): his spinal cord injury. And the record indicates that on some level Mr. Walls's spinal cord injury has diminished his ability to care for himself while in custody. While Mr. Walls's physical condition has improved since the time of his accident in 2016, he is still reliant on a cane or walker to ambulate and he continues to suffer from an abnormal gait and chronic back pain. (ECF No. 72-1, at 31–32.)

It also appears to the Court that the COVID-19 pandemic has to a notable degree diminished Mr. Walls's ability to care for himself while in custody. In *United States v. Raia*, the Third Circuit held that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's . . . extensive and professional efforts to curtail the virus's spread." 954 F.3d at 597. In other words, a defendant's motion for compassionate release based in part on COVID-19-related concerns must move beyond "citing to nationwide COVID-19 statistics, asserting generalized statements on conditions of confinement within the BOP, or making sweeping allegations about a prison's ability or lack thereof to contain an outbreak." *United*

*States v. Graham*, No. 12-cr-184, 2020 WL 3053106, at *4 (W.D. La. June 8, 2020) (citing *Raia*).

In the Court's estimation, the Defendant's motion has done just that. Mr. Walls is afflicted with several conditions that either increase his risk of infection or place him at higher risk of severe illness should he (again) contract the COVID-19 virus, such that he is able to differentiate his COVID-19-related concerns from that of other inmates and explain how his situation rises to an "extraordinary and compelling" level in light of the pandemic. Specifically, the Court reaches this conclusion after considering Mr. Walls's situation against the backdrop of the CDC's guidance as to conditions that either place an individual at increased risk of severe illness should they contract the COVID-19 virus, or increase an individual's risk of becoming infected in the first place.

As an initial matter, evidence suggests that Mr. Walls's spinal cord injury puts him at particular risk in light of the COVID-19 pandemic. The Mayo Clinic notes that "spinal cord injuries of any kind may result in . . . [d]ifficulty breathing, coughing, or clearing secretions from your lungs." *Spinal Cord Injury*, Mayo Clinic (last updated Sept. 17, 2019), https://mayocl.in/3bGsuZW. Such is the case because "[t]he muscles (diaphragm, intercostal, and abdominal) needed for breathing and coughing may become weak after" a spinal cord injury. *How do Spinal Cord Injuries Affect the Body?*, University of Iowa (last updated Mar. 2018), https://bit.ly/3bPSFOh. In Mr. Walls's case, he sustained a T7–T12 spinal cord injury, which could impact his respiratory function:

> Coughing is needed to clear the lungs of secretions and bacteria. If a person has a weak cough or cannot clear secretions from their lungs, they will be at higher risk for an infection, such as pneumonia. An injury at C4 or higher will affect the diaphragm, the muscle that moves the lungs for breathing. A T1 to T11 injury will affect the intercostal muscles, the muscles between the ribs. A T7 to T12 injury will affect the abdominal

muscles. The body needs the diaphragm, the intercostal muscles, and the abdominal muscles to breathe and cough well.

*Id.*

And that is particularly noteworthy in light of the fact that those infected with the COVID-19 virus typically present respiratory symptoms. *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention (last updated Oct. 27, 2020), https://bit.ly/3bC7TGe; *see also United States v. Garner*, No. 14-cr-13, 2020 WL 3632482, at *4 (S.D. Tex. July 3, 2020) ("[I]t [cannot] be seriously disputed that spinal cord injuries can leave some individuals medically vulnerable to serious respiratory infections," nor can it be disputed "[t]hat COVID-19 presents an especially serious risk of respiratory complication or failure for some medically vulnerable individuals.").

In addition, Mr. Walls's situation is compounded by the fact that he also appears to suffer (even if only more modestly at the moment) from three (3) other conditions that could increase his risk for severe illness should he (again) contract the COVID-19 virus. First, the record indicates that Mr. Walls suffers from asthma and that he currently maintains an active prescription for an albuterol inhaler. (ECF No. 72-1, at 66.) Second, Mr. Walls "is borderline hypertension" and his "blood pressure has bobbled in the past but [he] is not on medication." (ECF No. 72, at 8, 16.) These two (2) conditions are included on the CDC's lists of "high risk" conditions that potentially place an individual at increased risk of severe illness should they contract the COVID-19 virus. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Oct. 16, 2020), https://bit.ly/2CrTAqa. Third, records from both 2018 and 2020 note that Mr. Walls's BMI was calculated at a value of 31–32.8, which is in the "obese" range. (ECF No. 72, at 18, 28.) And according to the CDC, adults with obesity "are at increased risk of severe illness" should they contract the COVID-19 virus. *See People with*

*Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (last updated Oct. 16, 2020),
https://bit.ly/2CrTAqa.

While two (2) of those conditions are included on the CDC's list of conditions that *might*
place an individual at increased risk, in the Court's estimation, all of those individual things add
up. And, Mr. Walls's situation is further compounded by virtue of the fact that he is afflicted
with several underlying medical conditions that could place him at higher risk for severe illness
should he contract the COVID-19 virus. *Id.* ("The more underlying medical conditions someone
has, the greater their risk is for severe illness from COVID-19.")[6].

On top of that, Mr. Walls's limited mobility is also a risk factor. The CDC notes that
"[p]eople who have limited mobility" could "be at increased risk of becoming infected." *People
with Disabilities*, Ctrs. for Disease Control & Prevention (last updated Sept. 11, 2020),
https://bit.ly/3bEQaOH. To some extent, Mr. Walls's mobility continues to be limited because he
remains reliant on a cane or walker to ambulate. And, because Mr. Walls is unable to ambulate
without touching an assistive device, that adds one (1) more way that he cannot easily reduce the
risk of infection. *See id.* (advising those with limited mobility to clean and disinfect "equipment
such as wheelchairs, scooters, walkers, canes, oxygen tanks and tubing, communication boards
and other assistive devices").

Accordingly, the Court finds that Mr. Walls's current condition rises to an "extraordinary
and compelling" level under the non-terminal option. He is continuing to recover from a major
spinal injury, and that condition along with several of his other medical conditions likely place
him at higher risk of severe illness should he (again) contract the COVID-19 virus. The
compounded and progressive nature of Mr. Walls's ailments substantially and materially

---

[6] In the supplemental filing by Mr. Walls's counsel, he notes that more recent CDC guidance would indicate that the
combination of Mr. Walls's health conditions would place him at a 4.5 times greater risk of hospitalization should
be become afflicted, again, with the COVID-19 virus. (ECF No. 80, at 3.)

differentiate his situation from others, such that his conditions are "extraordinary and compelling" for these purposes.

Lastly, the Court does not find that Mr. Walls's "extraordinary and compelling" situation is diminished by the fact that he has already tested positive for the COVID-19 virus while in custody. As an initial matter, there is currently no medical consensus as to whether someone who has tested positive for the COVID-19 virus—such as Mr. Walls—will be protected from reinfection. *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention (last updated Oct. 27, 2020), https://bit.ly/3hPEnyW ("[T]he probability of SARS-CoV-2 reinfection is expected to increase with time after recovery from initial infection due to waning immunity and possibly genetic drift. Risk of reinfection depends on the likelihood of re-exposure to infectious cases of COVID-19. As the COVID-19 pandemic continues, we expect to see more cases of reinfection."); *see also* Preetika Rana, *Can You Catch Covid-19 Twice?*, Wall Street Journal (July 8, 2020), https://on.wsj.com/2Dd15lx ("Most scientists say that people who have had COVID-19 gain some immunity to the virus that causes it. What they don't know is whether that protection lasts a few months, a few years or a lifetime.").

And the risk of reinfection appears to be somewhat higher for those who have tested positive for the virus but appear to be asymptomatic or minimally symptomatic, such as Mr. Walls. *See* Quan-Xin Long, et al., *Clinical & Immunological Assessment of Asymptomatic SARS-CoV-2 Infections*, Nature Medicine (June 18, 2020), https://go.nature.com/3ifR85S (presenting data suggesting that "asymptomatic individuals [have] a weaker immune response to SARS-CoV-2 infection"); *see also* Apoorva Mandavilli, *You May Have Antibodies After Coronavirus Infection. But Not for Long.*, New York Times (June 18, 2020), https://nyti.ms/3g63f4O

(suggesting that asymptomatic individuals do not necessarily receive an "immunity certificate" if infected with the COVID-19 virus because the antibodies developed "may last only two to three months, especially in people who never showed symptoms while they were infected").

In addition, the record in Mr. Walls's case does not indicate that his "recovered" status ensures that he is not currently suffering from lingering or latent effects caused by contraction of the virus (even if unbeknownst to him at this time), or that his long-term health has not been negatively impacted. Rather, just like with Mr. Walls's risk of reinfection, those aspects remain uncertain, but have not yet been ruled out. *See* Quan-Xin Long, et al., *Clinical & Immunological Assessment of Asymptomatic SARS-CoV-2 Infections*, Nature Medicine (June 18, 2020), https://go.nature.com/3ifR85S (documenting the clinical patterns of asymptomatic infections and finding that many of the asymptomatic individuals studied developed signs of minor lung inflammation while exhibiting no other symptoms); *see also* Apoorva Mandavilli, *Can You Get Covid-19 Again? It's Very Unlikely, Experts Say*, New York Times (July 22, 2020), https://nyti.ms/3faYwOb (stating that while "[i]t may be possible for the coronavirus to strike the same person twice," it is more likely "that some people [will] have a drawn-out course of infection, with the [COVID-19] virus taking a slow toll weeks to months after their initial exposure").

The Court would also point out that counsel for the Defendant stated that Mr. Walls primarily presented gastrointestinal issues including diarrhea, which the CDC has noted can serve as the prelude to more severe respiratory symptoms. *See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Ctrs. for Disease Control & Prevention (last updated Oct. 27, 2020), https://bit.ly/3hPEnyW ("Many people with COVID-19 experience gastrointestinal symptoms such as nausea, vomiting or diarrhea,

sometimes prior to developing fever and lower respiratory tract signs and symptoms.")[7] In other words, just because Mr. Walls was quarantined for ten (10) days when he was first infected with the coronavirus doesn't necessarily mean that he is not currently dealing with fallout from contracting the virus, or that he won't continue to exhibit symptoms in the future.

The long and short of it is this: In a world in which the circumstances surrounding the COVID-19 pandemic in general are fraught with uncertainties, this Court must make its determination based on the concrete information before it. And the Government has essentially (and in the Court's estimation, quite appropriately) acknowledged as much. (*See* ECF No. 69, at 12 (stating that the Government "fully understands and acknowledges that it is unclear whether someone who has tested positive for COVID-19 will be protected from reinfection, even if they are asymptomatic" and that "the long-term effects of [] COVID-19 are yet unknown") (citing *United States v. Davidson*, No. 16-cr-139-2, 2020 WL 4877255, at *20 (W.D. Pa. Aug. 20, 2020).)

Here, the record reflects that Mr. Walls faces a number of physical challenges as a result of his spinal cord injury and that the CDC has identified several of his other underlying conditions as placing him at a meaningful level of increased risk for severe illness in light of the pandemic.[8] And in the absence of other concrete contrary information that would weigh against those factors, the Court finds that Mr. Walls's several medical conditions, viewed in light of the COVID-19 pandemic, remain "extraordinary and compelling" for purposes of this Court's compassionate release analysis. But by law, that is not the end of the Court's consideration.

---

[7] Mr. Walls notes that given his materially limited physical mobility and the use of a walker due to his spinal cord injury, the impact of these conditions when these symptoms were present was especially demanding and demeaning. (ECF No. 62, at 4.) The Court has no basis to call that report into question.

[8] The supplemental filing at ECF No. 80 reflects that as of September 1, 2020, Mr. Walls was resident in a large room with fourteen (14) other inmates, which he reports substantially impairs his ability to socially distance himself from others, and vice versa.

## C.  The § 3553(a) Factors

Even though the Court finds that an "extraordinary and compelling" reason could warrant Mr. Walls's release, it must also consider whether release is appropriate in light of the factors set forth in § 3553(a). Specifically, "in considering the section 3553(a) factors, [the Court] should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Bess*, 455 F. Supp. 3d 53, 6610 (W.D.N.Y. Apr. 22, 2020).

In addition, the Third Circuit recently affirmed that the determination of "whether to reduce an eligible defendant's term of incarceration for compassionate release after considering the § 3553(a) factors is committed to the discretion of the [district court]." *United States v. Jones*, No. 12-cr-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (citing *United States v. Pawlowski*, 967 F.3d 327 (3d Cir. June 26, 2020)). That discretion includes the district court's ability to consider the length of the defendant's original custodial sentence, including the portions served and remaining, when weighing the § 3553(a) factors. *Pawlowski*, 967 F.3d at 330–31.

Here, the Government argues that any reduction of Mr. Walls's sentence would be inappropriate at this time because the Defendant remains a danger to society and because the § 3553(a) factors continue to support the sentence that this Court originally imposed. (*See* ECF No. 69, at 13–16.) Specifically, counsel for the United States argues that the Court already "considered the mitigating factor of defendant's spinal condition at sentencing and varied downward accordingly" and any sentence less than that originally imposed would fail to "reflect

the seriousness of his offense and criminal history, afford adequate deterrence, and ensure just punishment." (*Id.* at 15.)

In essence, the Government asks the Court to focus its consideration on two (2) of the § 3553(a) factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the original sentence to reflect the seriousness of the offense and to deter future criminal conduct and to protect the public from further crimes by the defendant.

First, the Court acknowledges that the conduct at issue in this matter was very serious. Not only did Mr. Walls initiate a high-speed chase less than twenty-four (24) hours after starting supervised release on a prior federal sentence—a chase that left him seriously injured and put the public and law enforcement at substantial risk—but he also pleaded guilty to the illegal possession of two (2) loaded .40 caliber Glock pistols (one (1) of which was reported stolen in 2010), as well as an extended thirty (30) round .40 caliber magazine and .40 caliber ammunition. And at the time of sentencing, the Court noted that the seriousness of the matter was reflected in the fact that such firearms are not "modest firearm[s] for personal protection," but are typically selected for their "stopping power." (ECF No. 57, at 39.) In addition, as the Government aptly points out, the Defendant's actions at that time "demonstrated his strong intent to possess firearms," so much so that he violated the terms of his supervised release within hours of leaving federal custody and led the police in a high-speed chase in an apparent effort to conceal his illegal gun possession. (ECF No. 69, at 13.) The content and timing of that conduct raised then, and legitimately raises now, meaningful concerns as to Mr. Walls's commitment to abiding by any behavioral limitations that the Court would place on him if released.

And all of that occurred on the heels (quite literally) of Mr. Walls's previous federal conviction at No. 12-cr-173. In that case, Mr. Walls pleaded guilty to possession with intent to distribute 100 grams or more of heroin and was sentenced to a term in custody of sixty (60) months, followed by a term of supervised release of four (4) years. As indicated above, Mr. Walls violated the terms of that supervised release within twenty-four (24) hours of being released from custody.

The record before the Court demonstrates that it is a close call as to whether the original purposes of sentencing have already been fulfilled such that release is appropriate at this time, but on balance, the Court concludes that they have been in the context of the sentence as it would exist after the Court's decision here. As to that particular issue, the Court first observes that Mr. Walls's medical conditions place him at a notably higher risk of severe illness should he again contract the COVID-19 virus, and that his physical condition comes with its own set of substantial challenges that will remain in place for a very long time. Whether Mr. Walls would be deterred or otherwise constrained from committing further offenses by virtue of his medical condition is a future uncertainty, but in the Court's estimation that is almost certainly the case. Mr. Walls's physical condition (and associated COVID-19 risks) would almost certainly make it far more difficult or even medically risky for Mr. Walls to engage in the type of behavior that he pleaded guilty to in the above-caption matter or in his prior case. At the same time, the Court also recognizes that Mr. Walls's current medical conditions are not so debilitating such that they (alone) would necessarily prevent Mr. Walls from engaging in any further or other criminal conduct if he were released at this point. But considered as a whole, the Court concludes that such conduct would be very difficult and therefore much less likely than would be the case with someone without the significant physical limitations facing Mr. Walls.

Neither the overall environment at FCI Loretto, nor the circumstances of Mr. Walls's medical care, on their own tip the scales in favor of release from custody. The record does not currently reflect any unwillingness or inability of the BOP to endeavor to appropriately address and manage public health concerns at FCI Loretto, or that such efforts at that location have been unsuccessful. FCI Loretto's success in curtailing the spread of the COVID-19 virus is reflected in statistics available on the BOP's website. While that facility previously recorded fifty-five (55) inmates and three (3) staff members as testing positive for the COVID-19 virus, as of October 29, 2020, FCI Loretto housed zero (0) "positive" inmates and had eight (8) "positive" staff members. *See COVID-19*, Federal Bureau of Prisons (last updated Oct. 29, 2020), https://www.bop.gov/coronavirus/. Further, the record does not currently reflect that the BOP is unwilling or unable to provide appropriate or necessary medical evaluation, support, and care for the Defendant, or others, should they become afflicted with COVID-19, nor does it indicate that Mr. Walls's current medical afflictions are not being treated or addressed by the BOP.[9]

In applying, as it must, the §3553(a) factors, the core question is whether granting the release motion would run counter to the purposes of sentencing to such a degree that they would in essence overcome the reality of the Mr. Walls's physical and medical condition. The corollary question becomes whether the period that Mr. Walls has already spent in custody has fulfilled the

---

[9] The Court would also note that in terms of his generalized medical care, Mr. Walls was initially assigned to a Chronic Care Clinic at a Federal Medical Center. And, based on the record now before the Court, it cannot and does not conclude that the quality of Mr. Walls's medical care at either FMC Rochester or FCI Loretto has been insufficient or inappropriate. For example, the Court would point out that in addition to regular medical visits regarding his spinal cord injury, Mr. Walls also appears to have had extensive dental work done while in custody. (*See* ECF No. 72, at 45; ECF No. 72-1, at 68–69.). A review of Mr. Walls's BOP medical records would appear to demonstrate on-going, timely, and significant medical care provided at both facilities, and a methodical overall improvement in Mr. Walls's condition.

While counsel for the Defendant insinuates that "[Mr. Walls's] continued incarceration, especially during the BOP lockdown is hindering his progress in regaining full strength in his legs," the record presently before the Court does not suggest that Mr. Walls is not currently receiving necessary physical therapy (when the Defendant was transferred from FMC Rochester, his physical therapy was "self-directed") or that he would be able to access substantially better care if released to home detention. (ECF No. 62, at 7 (relying on a medical report from 2016).) Those are factors that are legitimately part of the overall mix of decisional factors now before the Court.

original purposes of sentencing such that any additional time in custody would now be "greater than necessary" to fulfill the purposes of sentencing in the context of the overall picture that the record presents. While counsel for the Defendant has reported that "Mr. Walls has made extensive efforts to rehabilitate himself by participating in BOP programming, including Personal Finances, Personal Growth, Community Relations, Freedom from Drugs, and Employment Skills," as well as by "maintain[ing] employment while in BOP custody as an Orderly in the recreation department," the Court does not find that such considerations themselves support a further reduction in Mr. Walls's sentence at this time. (*See* ECF No. 62, at 20.)

That finding, however, does not minimize the physical challenges that Mr. Walls has had to overcome, or the substantial and serious risks that his comorbidities would generate were he to be reinfected with the coronavirus in the communal custodial setting in which he now resides, or would reside in a halfway house. Considered with those things is the balance of the entirety of Mr. Walls's situation, including his violation of his supervised release in the case at No. 12-cr-173, and whether the time that he has already spent in custody is sufficient to deter him from committing future offenses or to reflect the seriousness of the offenses committed. In the Court's estimation, releasing him at this point would be unlikely to undermine the goals of sentencing. It is true that Mr. Walls had spent about forty-one (41) months in federal custody for his prior drug trafficking offense, which did not deter him from committing the conduct at issue in this case less than twenty-four (24) hours after being released from that custody and starting supervised release on his prior sentence. That forty-one (41) months in custody was not enough to deter Mr. Walls from committing future offenses, so the question becomes whether it is "necessary" to fulfill the deterrence purposes of sentencing in this case to require Mr. Walls to now spend the

next six (6) additional months in federal prison, followed by six (6) months thereafter in a halfway house (or at the BOP's discretion, home confinement). The Court concludes that it is not.

Much has changed since Mr. Walls served his sentence in that prior case. First, he, and his life, have been changed immeasurably by the severe spinal injuries caused by his ill-conceived decision to engage in his high-speed flight. His significant physical limitations place upon him a type and magnitude of deterrence that will in the Court's judgment limit his ability to engage in further criminal conduct.[10] Second, he has already contracted the coronavirus once, and the risk of a more severe outcome for him were he to acquire it again is substantially greater than for others in the population, a risk amplified in the communal setting present in a BOP facility, no matter the care with which that agency addresses the pandemic. Third, his ability to engage in self-care in a BOP facility is limited, as is his ability to socially distance to avoid reinfection. In the Court's judgment, those factors will if anything be substantially exacerbated once he enters a halfway house, in that it will not possess the far more robust "on site" medical staff and programming present in a BOP prison. The impact on Mr. Walls of the coronavirus infection that he has already suffered materially exceeds the impact on anyone without his physical limitations, and those impacts would be compounded were he to become reinfected.

The Court originally sentenced Mr. Walls to a term of custody that was below the advisory Guidelines range specifically because the Court knew that Mr. Walls's time in custody was going to be "harder time." (ECF No. 57, at 65.) But the Court did not anticipate the COVID-19 pandemic at the time of sentencing, or that such situation would come with its own set of serious risks and resulting challenges for Mr. Walls. Indeed, it is not lost on the Court that the

---

[10] It does not appear to the Court that this is a case in which a defendant previously committed further federal crimes after being afflicted with the very medical conditions upon which their current release request was posited. *See United States v. Iezzi*, No. 17-cr-157, 2020 WL 4726582, at *10 (W.D. Pa. Aug. 14, 2020).

reality of living through the experience of testing positive for the COVID-19 virus while incarcerated and being quarantined in a prison setting is a more traumatic experience. While the Court should also consider that it had in essence preemptively accounted for the fact that Mr. Walls's time in custody was going to be more "laborious and difficult" due to his physical condition and fashioned an appropriate sentence in light of such, that does not preclude the Court from considering the situation as it has now actually unfolded from sentencing to the time of this decision, and the Court believes that it should, and must, consider the entire picture as it exists now. *See* 18 U.S.C. § 3661; *Pepper v. United States*, 562 U.S. 476, 491 (2011); *see also United States v. Gray*, 416 F. Supp. 3d 784, 790 (S.D. Ind. 2019) ("Mr. Gray has served much of his sentence while seriously ill. This means that his sentence has been significantly more laborious and difficult than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)."). The reality is that the enhanced impact of prison custody present at the time of Mr. Walls's sentencing has by any measure been amped up to a notable degree by virtue of his affliction with the coronavirus and its attendant effect on him in his physical condition, and in the context of an institutional setting that must by necessity be materially restricted for the health protection of its residents.

The Court also believes that it is both appropriate and necessary to recognize that Mr. Walls is essentially asking to move to alternative confinement about six (6) months ahead of schedule.[11] Thus, the question before the Court boils down to whether having Mr. Walls remain

---

[11] The initial Guidelines range at No. 16-cr-249 was a term in custody of fifty-seven (57) to seventy-one (71) months. In addition, the Guidelines range for Mr. Walls's supervised release violation at No. 12-cr-173 was a term in custody of four (4) to ten (10) months. In adding those ranges together, Mr. Walls was initially faced with an aggregate Guidelines range of sixty-one (61) to eighty-one (81) months in custody, but the Court instead sentenced him to an aggregate term of forty-eight (48) months in custody (i.e., thirteen (13) months below the lower end of the recommended aggregate Guidelines range and thirty-three (33) months below the higher end of that range). And, as indicated above, Mr. Walls has served about twenty-nine (29) months in custody as of the date of this Opinion.

in a federal prison for six (6) more months, in the context of all of the circumstances now present, is "necessary" for his sentence to fulfill the statutory purposes of sentencing. The Court concludes that it is not.

The Court believes that the sentences as imposed meaningfully and seriously considered the impact of Mr. Walls's then-present medical conditions (ones that have improved to a degree while in custody). And he has served twenty-nine (29) months in prison. But, for the reasons noted above, the overall situation as to Mr. Walls, his physical condition and particularly as to the interaction of those conditions with the coronavirus has caused the situation to change in material and significant ways. That, too, must be part of the Court's consideration here in applying the §3553(a) sentencing factors to the situation now before the Court. In the Court's estimation, what will turn out to be a sentence of twenty-nine (29) months in federal prison, followed by twelve (12) months of monitored home detention, will continue to reflect the seriousness of Mr. Walls's offense in the specific circumstances that he now presents. Given his particular on-going limitations, in the Court's judgment there is no incremental specific or general deterrent effect that would come from requiring the next twelve (12) months of his sentence to be spent in a combination of prison and a halfway house that will not be soundly met by his monitored and supervised home detention, and the Court believes and concludes that such detention will also adequately protect the public from any further criminal conduct by Mr. Walls. When considering the full record before the Court, the Court concludes that the sentence, as modified by the Court here, will remain a sentence that is both "sufficient" and "not greater than necessary" to fulfill the purposes of sentencing in Mr. Walls's case.

Based on the record before it, the Court concludes that while this is a close call in factoring in the seriousness of Mr. Walls's offense conduct with the significant medical and

physical conditions as they now exist, Mr. Walls's motion is well taken. Consistent with the provisions of §3582(c), the Court will reduce Mr. Walls's sentences by converting the balance of the total time remaining on the custodial portions of his sentences, from the date of the Order implementing this Opinion to and including October 24, 2021, to an additional period of supervised release subject to all conditions of supervised release imposed at the time of sentencing, with the additional condition that the period of additional supervised release be a period of home detention monitored in whatever fashion that the Probation Office finds to be effective in its discretion. The record now before the Court demonstrates that Mr. Walls's situation is now so materially different than it was at the time of sentencing such that the "extraordinary and compelling" nature of Mr. Walls's situation sufficiently counterbalances the § 3553(a) sentencing factors so as to warrant a sentence reduction as set forth above.

## IV.  **CONCLUSION**

Mr. Walls's medical situation is serious, has gotten worse with his COVID-19 infection, and the Court will not discount the physical challenges that he has had to overcome, both due to his spinal cord injury and his infection with the COVID-19 virus. But the crimes he committed are also quite serious, and they posed a risk of serious harm to the community. The Court has considered the relevant factors set forth in § 3582(c), as well as the applicable policy statements issued by the Sentencing Commission and the factors set forth in § 3553(a). The Court finds that Mr. Walls's Motion is properly before it and that his medical conditions rise to an "extraordinary and compelling" level in light of the COVID-19 pandemic, and that the record presently before the Court indicates that release of Mr. Walls at this time would not undermine the original goals of sentencing in this case such that a sentence modification would be inappropriate. To the contrary, the Court finds and concludes that upon consideration of the record now before it, a

sentence reduction in the nature of compassionate release to monitored home detention for the approximately one (1) year remaining on Mr. Walls's overall custodial sentences is fully supported by the factual record, and nonetheless results in an overall sentence that is "sufficient" to fulfill the purposes of sentencing in this case. Accordingly, the Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at ECF No. 62 is hereby GRANTED as set forth above.

An appropriate Order will issue.


Mark R. Hornak
Chief United States District Judge


Dated:   November 2, 2020

cc:      All counsel of record